*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* W. C. SURLINE, Minor.

UNPUBLISHED
February 8, 2024

Nos. 365664; 365665
St. Clair Circuit Court
Family Division
LC No. 21-000053-NA

Before: RIORDAN, P.J., and CAVANAGH and GARRETT, JJ.

GARRETT, J. (*concurring in part, dissenting in part*).

In Docket No. 365665, I concur with the majority's decision to affirm the trial court's order terminating the parental rights of respondent-father to the minor child, WCS. But in Docket No. 365664, I respectfully dissent. I would reverse the trial court's order terminating respondent-mother's parental rights to WCS because clear and convincing evidence was not presented to support the statutory grounds for termination under MCL 712A.19b(3)(c)(*i*), (g), and (j).[1]

## I. FACTUAL BACKGROUND

Children's Protective Services (CPS) first became involved with respondents based on reports that respondent-father failed to properly supervise WCS. In April 2021, the Department of Health and Human Services (DHHS) filed a petition alleging, among other things, that respondents tested positive for illegal substances, improperly supervised the children, and failed to participate in voluntary services. Specifically, respondent-mother tested positive for amphetamine, methamphetamine, and THC in January 2021, and she exhibited signs of substance use during a March 2021 meeting. The petition was authorized in May 2021, and the respondents entered pleas to the trial court's exercise of jurisdiction in June 2021.

At that point, respondent-mother was pregnant and soon began having complications. On October 15, 2021, respondent-mother gave birth to GJS, who was severely premature at only 26 weeks' gestation. Over the next eight months, GJS remained at the children's hospital in Ann

---

[1] The trial court did not terminate respondent-mother's parental rights to EW, so this opinion will only discuss facts relevant to WCS.

Arbor, and respondent-mother lived in a hotel near the hospital so she could remain with GJS. Respondent-mother participated in GJS's care and learned his medical needs, with the hope that she could care for him when he was released. Tragically, respondent-mother never got that opportunity, as GJS passed away on June 6, 2022. GJS was respondent-mother's fifth pregnancy, but she now had only two surviving children.

While respondent-mother was at the hospital with GJS, then four-year-old WCS was removed from her custody and placed with paternal relatives. Despite respondent-mother's visitation schedule being limited while she helped care for GJS, respondent-mother had near daily phone or video calls with WCS. She also obtained a three-bedroom apartment in Port Huron in May 2022, which DHHS assessed and considered appropriate for the children. Beginning in July 2022, respondent-mother relapsed and again began testing positive for methamphetamine and other illegal substances. Respondent-mother did not take responsibility and denied using drugs. She continued to test positive on drug screens through December 2022, with a few interspersed negative tests. Respondent-mother completed inpatient substance abuse treatment in early January 2023. She had one positive drug screen after her discharge from treatment, but at the time of the termination hearing, she had tested negative on seven consecutive drug screens.

By the termination hearing in March 2023, WCS had recently turned six years old. The trial court heard testimony from a CPS investigator, a foster care worker, respondent-mother, and her own mother. The court found that clear and convincing evidence supported terminating respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). The court also found that termination was in WCS's best interests.

## II. LEGAL ANALYSIS

Because insufficient evidence was presented to establish any statutory grounds for termination, I would reverse the trial court's order terminating respondent-mother's parental rights to WCS.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Clear and convincing evidence is "the most demanding standard applied in civil cases." *In re Martin*, 450 Mich 204, 226-227; 538 NW2d 399 (1995). Evidence is clear and convincing when it "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id*. at 227 (cleaned up). We review the trial court's determination of statutory grounds for clear error. *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 272-273 (cleaned up).

As noted, the trial court found that clear and convincing evidence supported termination of respondent-mother's parental rights to WCS under MCL 712A.19b(3)(c)(*i*), (g), and (j). These provisions permit termination when:

-2-

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.  [MCL 712A.19b(3).]

Starting with MCL 712A.19b(3)(c)(*i*), I agree that one of the conditions that led to adjudication—respondent-mother's challenges with substance abuse—continued to exist by the termination trial.  I cannot agree, however, that clear and convincing evidence established that there was "no reasonable likelihood" that respondent-mother would rectify the condition within a reasonable amount of time considering WCS's age.

Respondent-mother had demonstrated for over a year—a period in which she essentially lived with her medically fragile newborn son—an ability to live substance-free.  During this time, respondent-mother tested negative on all drug screens, and by all accounts was sober, while pregnant and while remaining by the hospital with GJS.[2]  Despite the unimaginable loss that respondent-mother suffered when GJS passed away, she initially maintained her sobriety and continued progressing with her service plan.  She had stable housing, employment, and significant amounts of unsupervised visitation time with WCS and EW.  According to the foster care worker, the children were staying with respondent-mother for three or four days at a time.  But soon, respondent-mother struggled to cope with her grief and turned to unhealthy behaviors from her

---

[2] The trial court clearly erred when it gave no credit to respondent-mother's period of sobriety while she was in Ann Arbor with GJS; this finding rested on the court's mistaken belief that respondent-mother "was never [drug] tested" during this period.  While respondent-mother was not required to test as often because of the circumstances involving GJS, she did receive several negative drug screens over this time.  For instance, at the March 14, 2022 review hearing, which summarized respondent-mother's progress over the prior three months, the foster care worker read her report into the record.  The report stated that respondent-mother "has been screened three times this reporting period, and all of those have been negative" and noted that respondent-mother "does not exhibit any signs of substance abuse."

past. Just as DHHS was ready to recommend reunification of the children with respondent-mother, she began using illegal substances again and relapsed. After a six-month struggle with substance abuse, respondent-mother again showed progress during the two months between leaving inpatient substance abuse treatment and the termination hearing. After one post-discharge positive drug screen in January 2022, respondent-mother had seven straight negative screens right before the termination hearing. Respondent-mother was also consistently participating in therapy, Alcoholics Anonymous/Narcotics Anonymous programming, and parenting classes. She had been providing pay stubs to verify income from her job and had filed for divorce from respondent-father.

Considering the record as a whole, I am definitely and firmly convinced that clear and convincing evidence did not support termination under MCL 712A.19b(3)(c)(*i*). The fact that respondent-mother had been doing so well with her sobriety for the majority of the lower court proceedings strongly suggests that she could rectify her struggles with substance abuse within a reasonable amount of time, even considering WCS's young age. The evidence that respondent-mother had reestablished a pattern of sobriety and was participating in services after leaving inpatient treatment reinforces this conclusion. While I share the majority's concerns that respondent-mother misrepresented her substance abuse history several times, parents do not lose their fundamental liberty interest in the care and custody of their children "simply because they have not been model parents." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). We demand more for termination, requiring clear and convincing evidence during the statutory-grounds stage because "the child and the parent share a vital interest in preventing erroneous termination of their natural relationship until the petitioner proves parental unfitness." *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013) (cleaned up). Although respondent-mother has not always been a model parent, she has demonstrated the ability to overcome her addiction and maintain her sobriety. Under the heightened standard of proof of clear and convincing evidence, the case for termination under MCL 712A.19b(3)(c)(*i*) falls short.

The trial court also clearly erred by finding statutory grounds to terminate respondent-mother's parental rights under MCL 712A.19b(3)(g) and (j). In support of these grounds, the trial court relied on evidence that respondent-mother failed to benefit from services throughout the proceedings. Indeed, a parent's failure to benefit from a service plan is evidence that the parent cannot provide proper care and custody to a child, and a parent's failure to comply with her service plan is evidence that the child will be harmed if returned to the parent's home. *In re White*, 303 Mich App 701, 710-711; 846 NW2d 61 (2014).

For similar reasons already discussed, any noncompliance on respondent-mother's part did not rise to the level of clear and convincing evidence to support termination under MCL 712A.19b(3)(g) and (j). DHHS did not establish that there was "no reasonable expectation" that respondent-mother could provide proper care and custody to WCS within a reasonable time considering his age, MCL 712A.19b(3)(g), nor that there was a "reasonable likelihood" that WCS would be harmed if returned to respondent-mother's home, MCL 712A.19b(3)(j). At the time of termination, respondent-mother had been living in suitable housing for almost one year, possessed a job, and demonstrated that she was ending her toxic relationship with respondent-father. The record also evinced that respondent-mother generally had a positive history of visitation with WCS, and there was no evidence of any major concerns with her parenting ability. Combined with the progress that she had made on her sobriety, I am definitely and firmly convinced that the

trial court erred by terminating respondent-mother's parental rights to WCS under MCL 712A.19b(3)(g) and (j).[3]

Besides parting ways with the majority on the outcome, I disagree with several statements in the majority opinion. First, the majority speculates that respondent-mother's progress before the termination hearing "appear[ed] to be motivated more by the filing of the permanent-custody petition than the sudden desire to be reunited with her children." There is no basis to imply that respondent-mother did not sincerely hope for reunification with WCS and EW. Time and again, respondent-mother expressed how much she wanted to have her children back in her care.[4] While respondent-mother made many mistakes along the way, I do not question her genuine desire for reunification. Second, the majority inaccurately portrays the record, overlooking the progress respondent-mother made while these proceedings went on. For instance, the majority claims that respondent-mother's compliance before the termination hearing did not represent a forward trend, "particularly considering respondent-mother's lack of progress during the preceding 21 months." And the majority states that respondent-mother "continued to abuse illegal substances for most of the 21 months the children were court wards." It is untrue that respondent-mother failed to make progress throughout these proceedings and that she abused drugs for most of the 21 months. As discussed, respondent-mother did not have a single positive drug screen between at least July 2021 and June 2022.[5] She also had seven straight negative drug screens before the termination hearing. Third and finally, the majority claims that respondent-mother "sabotaged DHHS's efforts at nearly every turn." This statement vastly exaggerates the record, ignoring that respondent-mother signed full releases for all service providers besides her therapist and maintained consistent communication and visitation with her children.

In sum, the arc of respondent-mother's progress was overlooked for the permanence of termination. See *In re Dixson*, 981 NW2d 62 (Mich, 2022) (MCCORMACK, C.J, dissenting) ("As cases progress from initial disposition to final hearing, a parent's status at the final hearing date is all that matters—the arc of a parent's progress toward achieving challenging goals is not relevant."). I would reverse the trial court's order terminating respondent-mother's parental rights to WCS.

/s/ Kristina Robinson Garrett

---

[3] Without sufficient evidence to support statutory grounds for termination, it is unnecessary to address the trial court's best-interest findings.

[4] At a hearing in June 2021, just one week after GJS passed away, respondent-mother pleaded:

> I just want this to be over, Your Honor. I just want to grieve my son. And I've done everything that they've asked me to do here on Earth. And I've done beyond everything. I've never missed anything with the program, lady. Um, I just want my kids home with me [b]ecause I lost my son.

[5] There is also no evidence that respondent-mother was abusing illegal substances while she was pregnant, which would have likely begun sometime in April 2021.